IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



SALMONS, INC.,
    Plaintiff,
v.                                                                         Civil Action No. 2:10cv72
FIRST CITIZENS BANK & TRUST CO.,
    Defendant.

## OPINION AND ORDER

This matter comes before the Court on a Motion for Summary Judgment filed by Defendant First Citizens Bank & Trust Co. ("Defendant") on June 13, 2011.

### I.    FACTUAL AND PROCEDURAL HISTORY

Plaintiff Salmons, Inc. ("Plaintiff") is a Virginia corporation engaged in the purchase and export sale of agricultural grains.[1] Third Amended Complaint ¶ 1. At all times relevant to the Complaint, Plaintiff operated as a "grain hedger." Third Am. Compl. ¶ 6. As a grain hedger, Plaintiff's only exposure to changes in market price was in its margin account. Id. at ¶ 10. Plaintiff was required to maintain a margin account for its grain brokers based on the difference between its sales contract price and the market price for grain.[2] Id. at ¶ 12. Failure to adequately fund this margin account would result in Plaintiff's sales contracts being sold and its margin accounts liquidated. Id. at ¶ 17.

---

[1] These facts are drawn from the well-pleaded allegations of Plaintiffs' Third Amended Complaint, and are assumed to be true for purposes of this motion. See Philips v. Pitt County Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009). The Court expresses no opinion on the ultimate veracity of Plaintiff's claim.

[2] The Complaint does not specify exactly who or what imposed this margin requirement.

1

In order to purchase grain and to fund its margin account, Plaintiff secured agricultural loans from regional banks such as Defendant. Id. at ¶ 14. Between 2004 and 2008, Plaintiff secured a series of agricultural loans from Defendant. Id. at ¶¶ 22–23. In exchange, Plaintiff gave Defendant a security interest in its grain and in its purchase contracts with local farmers and dealers. Id. at ¶ 22. Between September 2004 and January 2008, Plaintiff and Defendant entered into a total of seventeen loan transactions, by which Plaintiff borrowed a total of $2.3 million. Id. at ¶ 23; Pl.'s Opp'n. to Def.'s Mot. Summ. J. at 9. In connection with each of these transactions, Plaintiff executed a Promissory Note, and in some cases Plaintiff also executed a Loan Commitment and Loan Agreement. Third Am. Compl. at ¶ 23.

In the fall of 2007 through the spring of 2008, grain market prices skyrocketed, rising to levels well above the sale price in Plaintiff's hedge contracts. Id. at ¶ 27. As a result, Plaintiff was required to place an increasing amount of funds into its margin account. To satisfy these margin calls, Plaintiff used both its own cash funds and bank loans from Defendant. Id.

On January 16, 2008, an individual named Eddie Jennings allegedly called Plaintiff on Defendant's behalf. Id. at ¶ 28. Jennings expressed concern about the rising price of grain and "specifically represented that, unless [Plaintiff] provided additional security in the form of a blanket lien on [its] equipment, [Defendant] would not continue funding [Plaintiff's] margin accounts." Id. At the time, Plaintiff faced a $400,000 shortfall in its margin account. Id. at ¶ 30. According to Plaintiff, both Plaintiff and Defendant understood that "unless [Plaintiff] used the $400,000 to make the pending margin call and unless [Defendant] continued funding the margin account when calls were made, [Plaintiff] stood to lose the entire margin account." Id.

On January 17, 2008, Plaintiff executed a blanket lien pledging all of its equipment, allegedly worth $3 million, as security for Defendant's "continued funding of [Plaintiff's] business operations, specifically margin calls." Id. at ¶ 32. On behalf of Plaintiff, James Salmons, Jr., also executed a Loan Commitment and Promissory Note for an $800,000 commodity loan from Defendant. Id. at ¶ 33. The Loan Commitment listed seven Conditions Precedent, including the following as "Condition Precedent 5":

> Borrower understands unequivocally that the Bank will not engage in financing associated with 'margin accounts' and should financing for same be necessary, borrower shall obtain alternative sources of financing.

Third Amended Complaint Ex. 17 at 3. None of the previous loan agreements that Plaintiff had signed contained any provision similar to Condition 5.

Notwithstanding this prohibition on the use of loan proceeds for margin account financing, Plaintiff alleges that Defendant "advanced $400,000 to [Plaintiff] for the specific purpose of satisfying the pending margin call." Third Am. Compl. ¶ 32. This would prove to be the last loan that Defendant would make. On January 23, 2008, during a scheduled meeting at Plaintiff's office, an individual named Ronnie James informed Plaintiff that Defendant would not provide any further funds from the $800,000 loan, even though Plaintiff had six days earlier pledged $3 million worth of collateral for the loan. Id. at ¶ 36. James further informed Plaintiff that Defendant would not make any further loans to Plaintiff. Id.

Ultimately, Plaintiff was able to deposit an additional $2,560,529 into its margin account. Id. at ¶ 37. On February 27, 2008, however, Plaintiff failed to make a margin call. Id. at ¶ 38. As a result, Plaintiff forfeited its hedge position, resulting in a loss of $4,184,903. Id. at ¶ 39.

3

Plaintiff was also unable to fulfill its purchase contracts. In the course of renegotiating these contracts, Plaintiff lost an additional $161,762. Id.

On July 16, 2009, Plaintiff filed an action in the Circuit Court for the City of Virginia Beach, Virginia, alleging that Defendant had engaged in actual and constructive fraud. See Compl. ¶¶ 39–53. Plaintiff sought $4,346,665 in compensatory damages, $350,000 in punitive damages, costs, and prejudgment interest. Id. at ¶ 54.

On or about February 12, 2010, Defendant filed a Notice of Removal. Defendant filed a Motion to Dismiss and Memorandum in Support on February 17, 2010. Instead of filing an Opposition to Defendant's Motion to Dismiss, Plaintiff filed its First Amended Complaint on March 1, 2010. Defendant then filed another Motion to Dismiss the First Amended Complaint on March 12, 2010. Once again, Plaintiff did not file an Opposition to Defendant's Motion to Dismiss. Instead, Plaintiff filed a Motion for Leave to file a Second Amended Complaint on March 25, 2010. This Motion was unopposed, and Plaintiff filed the Second Amended Complaint on March 31, 2010. Defendant filed a third Motion to Dismiss the Second Amended Complaint on April 19, 2010. Plaintiff filed an Opposition to this Second Amended Complaint on May 3, 2010, and Defendant filed a rebuttal on May 10, 2010.

On August 4, 2010, this Court granted Defendant's Motion to Dismiss, holding in pertinent part that North Carolina law governs the claim and that Plaintiff had not sufficiently pleaded claims for fraud or constructive fraud. The Court held that Plaintiff's claim for actual fraud could not be sustained because Plaintiff could not reasonably rely on Eddie Jennings' alleged oral promise that Defendant's funds would cover margin calls given that the plain language of the Loan Commitment prohibited using the loaned funds to cover margin calls. The

Court further held that Plaintiff's claim for constructive fraud was also defective because Plaintiff did not establish a relationship of trust and confidence with Defendant so as to establish a claim for constructive fraud. Having dismissed both counts of Plaintiff's Complaint, the Court granted Defendant's Motion to Dismiss in toto.

On August 25, 2010, the Court vacated its Order of August 4 to consider a Motion by Plaintiff to amend its Complaint for the third time, this time to include a cause of action under North Carolina's Unfair and Deceptive Trade Practices Act. On October 5, 2010, the Court granted Plaintiff's Motion to Amend, and directed Defendant to file any responsive pleading along with its Answer within 14 days of receipt of Plaintiff's Amended Complaint. Plaintiff filed a Third Amended Complaint on October 18, 2010. By Order dated December 17, 2010, this Court granted Defendant's Motion to Dismiss Counts One and Two of Plaintiff's Third Amended Complaint, and denied Defendant's Motion to Dismiss Count Three of the same. Now comes the Defendant seeking Summary Judgment as to Count Three of Plaintiff's Amended Complaint, alleging violations of North Carolina's Unfair and Deceptive Trade Practices Act.

## II. LEGAL STANDARD

In reviewing a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court construes all facts and inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007) (citing United States v. Diebold, Inc., 369 U.S. 564, 655 (1962); Saucier v. Katz, 533 U.S. 194, 201 (2001)). The Court will grant such a motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Id. at 323–24.

The moving party bears the initial burden of showing "the absence of an essential element of the nonmoving party's case and that it is entitled to judgment as a matter of law." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004). Once the moving party satisfies this burden, the nonmoving party then must recite specific facts showing that there is a genuine dispute of fact which merits a trial. Id. (citing Matsuhita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Summary judgment "will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." Honor, 383 F.3d at 185.

### III. ANALYSIS

North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. The elements of a claim under the UDTPA are: (i) an unfair or deceptive act or practice, or an unfair method of competition, (ii) in or affecting commerce (iii) which proximately caused actual injury to the plaintiff or to his business. Henson v. Green Tree Servicing, LLC, 676 S.E.2d 615, 619 (N.C. Ct. App. 2009) (citing Walker v. Fleetwood Homes of N.C., Inc., 627 S.E.2d 629, 631 (N.C. Ct. App. 2006)).

*A. Whether Defendant Engaged in an Unfair or Deceptive Practice*

The terms "unfair" and "deceptive" are not defined in the statute, but have been interpreted as such: "'If a practice has the capacity or tendency to deceive, it is deceptive for the purposes of the statute.' 'A practice is unfair when it offends established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" Id. at 619 (internal citations omitted) (citing Walker v. Fleetwood Homes of N.C., Inc., 627 S.E.2d 629, 631–32 (N.C. Ct. App. 2006)). More specifically, the Supreme Court of North Carolina has counseled that "where a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice." Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). As an additional note, "[w]ords or phrases, though literally true, may still be deceptive." In re Kittrell, 115 B.R. 873, 877 (M.D.N.C. 1990) (citing Johnson v. Phoenix Mut. Life Ins. Co., 266 S.E.2d 610, 610 (N.C. 1980)).

The Fourth Circuit has observed that "what constitutes an unfair or deceptive trade practice is a somewhat nebulous concept." Curtis B. Pearson Music Co. v. Everitt, 368 Fed. Appx. 450, 455 (4th Cir. 2010). Critically, a practice may be unfair or deceptive for purposes of the UDTPA without amounting to fraud. See id. (noting that the practice need not be untruthful and that the good faith of the actor is irrelevant to the question of deception). However, "'some type of egregious or aggravating circumstances must be alleged and proved before the Act's provisions may take effect." Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001) (quoting Allied Distribs., Inc. v. Latrobe Brewing Co., 847 F. Supp. 376, 379 (E.D.N.C. 1993)).

Plaintiff's Third Amended Complaint alleges that Defendant expressed intent to extend a loan to Plaintiff to cover an impending margin call, thereby inducing Plaintiff to sign a Loan

Commitment that took a blanket lien on all of Plaintiff's property, worth an alleged $3 million, while "secretly" prohibiting use of the funds to cover margin calls. Plaintiff contends that this prohibition was "secret" and deceptive because no similar clause was contained in any of the sixteen prior loan documents executed between Plaintiff and Defendant, and Defendant did not alert Plaintiff to this alteration to the otherwise routine contractual language in the Loan Commitment. Moreover, Plaintiff alleges that Defendant knew that Plaintiff intended to use the loan funds to meet margin calls, but that Defendant nonetheless extended the loan. Defendant responds that because the Loan Commitment, which Plaintiff's signatory admits he never read, in plain language prohibited use of the loan funds for margin calls, the agreement was neither unfair nor deceptive.

It is well-established that a party to a contract is responsible for reading it and will be bound by its provisions. See Curtis B. Pearson Music Co. v. McFayden Music, Inc., No. 1:04cv378, 2006 WL 3146423 at *2 (M.D.N.C. Oct. 31, 2006) (citing Isley v. Brown, 117 S.E.2d 821, 824 (N.C. 1961) and Davis v. Davis, 124 S.E.2d 130, 133 (N.C. 1962)); Harris v. Bingham, 97 S.E.2d 453, 454 (N.C. 1957) ("[O]ne who signs a paperwriting is under a duty to ascertain its contents, and in the absence of a showing that he was willfully misled or misinformed by the defendant as to the contents ... he is held to have signed with full knowledge and assent as to what is therein contained." (quoting Williams v. Williams, 18 S.E.2d 364, 366 (N.C. 1942))). However, "an exception to this rule exists where the party exercises reasonable diligence and is induced to enter the contract by the fraudulent acts of the other party." Curtis B. Pearson, 2006 WL 3146423 at *2.

Plaintiff alleges that Defendant engaged in an unfair or deceptive practice with respect to both Jennings' statement that the Bank would not continue funding margin calls unless Plaintiff gave the Bank a blanket lien on all of its construction equipment and Jennings' failure to alert Plaintiff to a material alteration to the Loan Commitment, which prohibited the use of loan funds to make margin calls. With respect to the former, Plaintiff claims that Defendant knew of Plaintiff's intent to use the January 17, 2008, loan to cover an impending margin call before the signing of that Loan Commitment. Id. ¶ 28. As to the latter, Plaintiff claims the existence of a course of dealing, established during the four-year lending relationship between the parties, whereby Defendant's loan officer had previously disclosed to and discussed with Plaintiff any material variations in a new Loan Committment prior to Plaintiff's signing.[1] Third Am. Compl. ¶ 24. The primary question, therefore, is whether Defendant's alleged manipulation of a course of dealing amounts to deception under the UDTPA.

Whether Defendant made deceptive misrepresentations or omissions is clearly a question of fact for the jury to decide. Gilbane Bldg. Co., 80 F.3d at 902. Thus, whether Jennings notified Plaintiff of the alteration to the Loan Commitment and whether Defendant extended the January 17 loan for the purpose of inducing Plaintiff to hand over $3 million worth of equipment as collateral are appropriate questions for a jury. However, whether such conduct constitutes an "unfair or deceptive" practice "is a legal issue for the court." Id.; United Lab., Inc. v. Kuykendall, 322 N.C. 643, 664 (1988) ("[I]t is a question of law for the court as to whether these

---

[1] Jennings' own testimony confirms the existence of this course of dealing. The following question was asked during Jennings' deposition: "So it was the practice of the bank that if they changed something in the loan documents, they would tell Mr. Salmons about that?" Jennings responded: "I would tell him. Yes sir." Jennings also confirmed that he would "point out any changes" in the Loan Commitment documents, and that the addition of a prohibition on using funds for margin calls would be the type of change which he would disclose. Jennings Dep. II at 8-9, 60. Jennings claims, however, that he did, in fact, notify Plaintiff of this change to the Loan Commitment. Id. at 60.

proven facts constitute an unfair or deceptive trade practice."). The Court's resolution of this legal issue necessarily turns on the specific facts of each case. Leake v. Sunbelt Ltd. Of Raleigh, 93 N.C. App. 199, 205 (1989).

Courts have applied the UDTPA "liberally." See Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 902 (4th Cir. 1996). Indeed, "deception" under the Act has been found to cover not only fraud and negligent misrepresentation, but also "broken promises" where the promisor had "no intent to perform when he made the promise" and failure to disclose when "tantamount to misrepresentation." Id. (citing Kron Med. Corp. v. Collier Cobb &Assoc., 107 N.C. App. 331, 340 (1992); Kent v. Humphries, 50 N.C. App. 580 (1981); Overstreet v. Brookland, Inc., 52 N.C. App. 444 (1981); Leake, 93 N.C. App. at 204-205. Normally, a promissory misrepresentation will not support an allegation of fraud. However, when [it] is made with an intent to deceive the purchaser and at the time of making the misrepresentation the defendant has no intention of performing his promise, fraud may be found." Leake, 93 N.C. App. At 204-205. Similarly, an omission constitutes "actionable fraud" only where it relates to a "material matter known to the party" and which it is that party's "legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances." Kron Med. Corp., 107 N.C. 331, at 340-41 (finding that insurer deceived insured through its silence due to the material nature of the information withheld and the fiduciary relationship between the parties).

Defendant relies upon Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 461 (1991), to claim that UDTPA does not apply where the express language of a contract contradicts the alleged oral misrepresentation. In Spartan, the court rejected the defendant's counterclaim

brought under the UDTPA and based on his contention that the plaintiff had tricked him into signing a guaranty on the misrepresentation that the document only addressed the forwarding of payments from payroll. In rejecting that claim, however, the court relied on the fact that the document in question was only one page long, that plaintiff and defendant were "independent businessmen" and the document was clearly labeled as a "GUARANTY." Id. By contrast, the Loan Commitment at issue here was five pages long, and the attached Promissory Note was also five pages long, and rife with small-print boilerplate language. Moreover, the "Conditions Precedent" section of the Loan Commitment for the seventeenth transaction, is *identical* to that contained within the previous Loan Commitment that Plaintiff signed on September 7, 2007, except that the fifth of the seven conditions precedent listed was changed to read: "Borrower understands unequivocally that the Bank will not engage in financing associated with 'margin accounts' and should financing for same be necessary, borrower shall obtain alternative sources of financing."[2] We thus reject Defendant's contention that the UDTPA does not support a claim where plaintiff enters a contract based upon an alleged oral misrepresentation, but contractual language contradicts that alleged misrepresentation.

The clause in the January 17, 2008, Loan Commitment prohibiting the use of loan funds to fund margin calls is undoubtedly a "material matter." Further, Defendant clearly knew that this language had been added to the Loan Commitment prior to Plaintiff's signing of the agreement. The only question remaining, therefore, is whether Defendant had a legal duty to alert Plaintiff to the change.

---

[2] The fifth condition precedent in the September 7, 2007, Loan Commitment stated: "At no time will outstanding loan balance exceed 85% of the net position of corn inventory (less payable) plus receivable amount (corn value determined by local Perdue published price)."

11

An ordinary lender-borrower relationship generally does not give rise to "special confidence" or create a fiduciary relationship. Branch Banking and Trust Co. v. Thompson, 107 N.C. App. 53, 61 (1992). Indeed, the Fourth Circuit has recognized that "North Carolina is reluctant to impose 'extracontractual fiduciary obligations' in the context of general commercial contracts; thus, even when parties to an arms-length transaction have reposed confidence in each other, no fiduciary duty arises unless one party thoroughly dominates the other." South Atlantic Ltd. P'ship of Tenn. L.P. v. Riese, 284 F.3d 518 (2002). Plaintiff's sole indication that its relationship with Defendant was not a "typical" debtor-creditor relationship is based on its claim that, given the number of transactions the parties had together executed, they had established a mutually understood course of dealing. It is in the context of that alleged course of dealing that Plaintiff argues that Jennings' silence with respect to the alteration to the Loan Commitment amounted to deception. The contours of a typical lender-borrower relationship, in addition to Plaintiff's specific allegations, suggest that there was an imbalance of power in Defendant's favor in its relationship with Plaintiff. However, Plaintiff's allegations nowhere allege that Defendant so "thoroughly dominate[d]" Plaintiff in the relationship as to give rise to a fiduciary relationship. Notwithstanding the alleged course of dealing between the parties, the circumstances of the relationship between Plaintiff and Defendant were not so extreme as to create a legal duty on Defendant's part to affirmatively disclose the addition of new terms in a Loan Commitment. Thus, standing alone, Jennings' failure to alert Plaintiff to the new clause does not constitute deception actionable under the UDTPA.

However, Plaintiff also alleges that, at the time Defendant presented the January 17, 2008, Loan Commitment, Defendant knew that Plaintiff intended to use the loan funds to finance

a margin call. Taking this allegation as true, as we are bound to do, begs the question of why, if Defendant knew of Plaintiff's intentions with respect to the loan, but also knew of the Loan Commitment's express prohibition on that use of the funds, Defendant would have agreed to extend the loan anyway. Plaintiff has supplied one possible explanation: Defendant extended the loan in order to induce Plaintiff to sign over a blanket lien on all of its construction equipment. When coupled with Defendant's failure to affirmatively and orally disclose the alteration to the Loan Commitment, Defendant's decision to extend a loan despite its knowledge that Plaintiff intended to use the funds for a prohibited purpose, casts an air of suspicion over the fairness of the transaction. Such conduct has a capacity to deceive, and thus qualifies as deceptive for the purposes of the statute. Walker, 627 S.E.2d at 631–32.

Viewing the evidence in the light most favorable to Plaintiff, as is appropriate on a Motion for Summary Judgment, the Court finds that Plaintiff has presented a genuine issue of fact with respect to its claim that Defendant misled Plaintiff into believing that the seventeenth Loan Commitment was materially similar to prior such agreements, and thereby inducing Plaintiff to sign the agreement. See Pearson, 2006 WL 3146423, at *2 (denying defendant's motion for summary judgment where plaintiff failed to read the final version of a contract which contained a provision not contained in previous versions).

### B. Whether Defendant's Allegedly Deceptive Conduct Caused Injury to Plaintiff

The court next considers Defendant's claim that Plaintiff was not damaged by the allegedly deceptive trade practice, and thus is not entitled to recovery under the UDTPA. To prevail on a claim under the UDTPA, a plaintiff must show that an unfair or deceptive trade practice "proximately caused actual injury" to the plaintiff. Craven v. Cope, 656 S.E.2d 729,

733-34 (N.C. App. 2008). What constitutes proximate cause between a deceptive act and plaintiff's injuries remains ambiguous. Dicta suggests that a plaintiff's reliance on a defendant's alleged deceptive act is unnecessary, see Rucker v. Huffman, 99 N.C. App. 137 (1990), but no court has permitted recovery without reliance. See Robert G. Byrd, Misrepresentation in North Carolina, 70 N.C. L. Rev. 323, 372 (1992). It is well-established, however, that when a "plaintiff's reliance is the causal link between the violative conduct and the damages, the reliance need not be reasonable: If unfair trade practitioners could escape liability upon showing that their victims were careless, gullible, or otherwise inattentive to their own interests, the Act would soon be a dead letter." Gilbane Bldg. Co., 80 F.3d at 903.

Plaintiff here claims that, by virtue of Defendant's securing a blanket lien on Plaintiff's equipment, Plaintiff was unable to secure alternate sources of financing to cover its margin call and thereby suffered more than $4 million in losses. Third Am. Compl. ¶¶ 38-39. Plaintiff contends that it would never have encumbered $3 million worth of assets for a one-time loan of $400,000 (the amount Plaintiff received and used to cover its initial margin calls) or $800,000 (the amount of the loan under the terms of the Loan Commitment), that Defendant knew this and thus intentionally deceived Plaintiff into thinking Defendant would continue funding margin calls in exchange for the blanket lien. The crux of Plaintiff's Complaint, therefore, is that, but for Defendant's deceptive practices, Plaintiff would not have agreed to give Defendant a blanket lien and instead would have been able to use the $3 million in equipment as collateral to secure alternative sources of funding to make its margin calls, thereby avoiding the margin losses suffered.

Defendant claims that Plaintiff was not prevented from securing any additional funding for margin calls as a result of the blanket lien, and thus that Plaintiff has not established the necessary element of proximate causation. To support this contention, Defendant states that Plaintiff never sought alternative sources of funding and that Plaintiff "*was not denied a single loan at any bank* [to meet margin calls] . . . *for insufficient collateral*." Def.'s Mem. in Supp. Of Mot. Summ. J. at 19(emphasis in original). Plaintiff responds by claiming that, because Defendant's blanket lien effectively tied up all of Plaintiff's available collateral, seeking alternative sources of funding would have been futile because banks do not extend unsecured loans to fund margin calls. Pl.'s Br. in Opp. to Def.'s Mot. Summ. J. at 24.

Defendant counters that, even after it obtained the blanket lien, Plaintiff still had sufficient collateral available to secure other loans. Specifically, Defendant points to Defendant's grain facility, which includes a granary structure, grain storage tanks, dryers, conveyors and aspirators. Plaintiff refutes that the grain facility would have been sufficient collateral to obtain a loan sufficient to cover the margin call, and instead contends that "the grain facility is worth nothing when it comes to serving as collateral for financing." Id. at 25. At this stage of the proceedings, Plaintiff has not established that it would have been able to secure financing from another bank to cover the margin call in the absence of Defendant's blanket lien. Nor has Defendant proved that Plaintiff's failure to seek alternative funding negates proximate cause or proof of injury. Whether Plaintiff suffered injury and whether Defendant's wrongdoing was the proximate cause of that injury are questions of fact for a jury to decide.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is **DENIED**. The Clerk is **DIRECTED** to transmit a copy of this Order to the all Counsel of Record.

**IT IS SO ORDERED.**

Norfolk, Virginia

October __, 2011

/s/
Robert G. Doumar
Senior United States District Judge